# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Chapter 11** |
| | ) | |
| **Citation Corporation, et. al.**[1] | ) | **Case No. 04-08130** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter came before the Court for hearing on October 17, 2005, on the Final Application of Miller Buckfire for Allowance of Compensation and Reimbursement of Expenses and the Objections of Citation Corporation and JP Morgan Chase Bank to the Application. The hearing was properly noticed and appearing were Michael L. Hall, Shannon Hoff, Glenn E. Glover and Douglas Bacon, attorneys for Debtors; Matthew Feldman, attorney for Miller Buckfire; Robert Adams and Kim Glass, for JP Morgan Chase Bank as Agent for the Pre-Petition Lenders (hereafter "Agent"); David B. Anderson and Donna G. McGee for Citation Funding, JP Morgan Chase, Wachovia Capital, Kelso Investment, KEP IV, and Magnetite Asset Investors; Jayna P. Lamar, attorney for the committee claims monitor; Lee R. Benton, as conflict counsel for the claims monitor committee; and Valry W. Early, Bankruptcy Administrator and Jon Dudeck, attorney with the Bankruptcy

---

[1]In addition to the Citation Corporation, the Debtors include the following entities: (i) Citation Holding Company, (ii) Berlin Foundry Corporation, (iii) Bohn Aluminum, Inc., (iv) Castwell Products, Inc., (v) Citation Precision, Inc., (vi) HI-TECH, Inc., (vii) Iroquois Foundry Corporation, (viii) ISW Texas Corporation, (ix) Mansfield Foundry Corporation, (x) OBI Liquidating Corp., (xi) Texas Steel Corporation, (xii) TSC Texas Corporation, (xiii) Citation Aluminum, LLC, (xiv) Citation Casting, LLC, (xv) Citation Grand Rapids, LLC, (xvi) Citation Lake Zurich, LLC, (xvii) Citation Michigan, LLC, (xviii) Citation Wisconsin Forging, LLC, (xix) Citation Wisconsin, LLC, (xx) ITM Holding Co., LLC, (xxi) Interstate Southwest, Ltd., (xxii) Texas Foundries Ltd., (xxiii) MFC Liquidating Company, Ltd., and (xxiv) Citation Camden Casting Center, Inc.

Administrator's office.  Appearing to testify were: Charles Bloome,  Durc Savini, Edwin Buker and William Redmund.  This court has jurisdiction. 28 U.S.C. § 1334(b).  This is a core proceeding. 28 U.S.C. § 157(b)(2)(A).  The Court has considered the pleadings, the arguments of counsel, the testimonial evidence, and the law, and the Court finds and concludes as follows.

## I. FINDINGS OF FACT

On July 30, 2004, Citation Corporation, et. al. (hereafter "Citation" or "Debtors") hired Miller Buckfire & Company, LLC (hereafter "Miller Buckfire" or "the Applicant"), pursuant to an Engagement Letter to provide Citation financial advisory and investment banking services necessary for a potential restructuring and/or sale.  Citation agreed to pay the Applicant $150,000.00 upon execution of the Engagement Letter and a restructuring fee of $3.5 million (hereafter "the Restructuring Fee").  Applicant was to receive monthly fees of $150,000.00 beginning August 30, 2004, which they agreed would be credited against the Restructuring Fee.  Citation filed a chapter 11 petition on September 18, 2004, and shortly thereafter, Debtors filed a Retention Application to retain Miller Buckfire. (Proceeding No. 161) There were several objections to Applicant's retention, but these were all either overruled, withdrawn or sustained.  This Court entered a Retention Order allowing Citation to retain Miller Buckfire for a flat monthly fee in addition to a contingent transaction fee as provided in the Engagement Letter, subject to 11 U.S.C. § 330 reasonableness standards.[2] (Proceeding No. 789)

The Court confirmed Citation's Plan about eight months after the cases were filed and within

_____

[2]The original Retention Application sought employment pursuant to 11 U.S.C. § 328, which does not incorporate the requirement that fees be reasonable as is provided in 11 U.S.C. § 330.  The Court specifically noted its concerns about this provision of the employment and Applicant consented to employment subject to approval of its fees as provided in 11 U.S.C. § 330.

Case 04-08130-TOM11    Doc 2657    Filed 02/17/06    Entered 02/17/06 13:48:34    Desc
Main Document      Page 2 of 22

five months of entry of the Order authorizing Miller Buckfire's retention. According to the Plan, pre-petition secured creditors accepted ninety-five percent of new common stock in exchange for discharge of a substantial portion of pre-petition secured debt. The holders of senior promissory notes issued by Citation Holding Company received the remaining five percent of the new common stock in exchange for a discharge of Citation Holding Company's debt obligations. General unsecured creditors will receive a pro rata distribution of $10 million that Debtors will fund.

In its fifth and final fee application, Miller Buckfire seeks approval of its Restructuring Fee for $3.5 million plus expenses. Applicant seeks final approval of all the fees paid to date by Debtors in the amount of $1,189,622.90[3] plus expenses totaling $180,215.26[4], leaving a balance due of $2,291,128.45 (which also reflects a credit for a pre-petition retainer held by Miller Buckfire for $54,051.87). (Proceeding No. 2316) The Bankruptcy Administrator has consistently objected to the amount of requested fees of Applicant in several general categories, including: travel time; time spent on the category "Retainer and Fee Applications"; time spent on project category "Exit Financing"; and the Bankruptcy Administrator objected to expenses claimed for Applicant's own attorneys' fees.[5] Debtors and Agent also objected to Applicant's final application, asserting that

---

[3]This figure is from Applicant's Fifth Interim and Final Application for Allowance of Compensation and Reimbursement of Expenses for Miller Buckfire & Co., LLC as Financial Advisor and Investment Banker to the Debtors for the Period September 18, 2004 through May 23, 2005 (hereafter "Fifth and Final Application"), however, as noted later in this opinion, it appears the amount paid should be $1,207,670.50. (Proceeding No. 2316)

[4]Pursuant to correspondence received after the hearing, the parties have reached an agreement that $65,148.51 in expenses are due Applicant. Applicant is also claiming $110,351.80 as reimbursement for attorney fees for its counsel and allowance of this amount shall be determined by this Court.

[5]The Engagement Letter provided that the Debtors would pay reasonable out-of-pocket expenses, including retained professionals.

3

Miller Buckfire's requested fee was unreasonably high because they did not perform the level of services originally anticipated. (Proceeding Nos. 2330 and 2332)

## A. Contentions of Applicant[6]

The Applicant alleges that it was hired by Citation as an investment banker, rather than as a financial advisor.[7] Investment bankers generally charge fixed, monthly fees plus additional fees that become payable upon consummation of a transaction or event.[8] The terms of the Engagement Letter were negotiated at arms length by Mr. Chuck Bloome[9], the Chief Financial Officer of Citation, and members of the Citation Board of Directors. Although this was Mr. Bloome's first experience with a company in chapter 11, he had worked with investment bankers in the past and knew they billed by the project, not by the hour. Having a fixed fee encourages investment bankers to pursue the best restructuring for a debtor and creditor and provides incentive to work efficiently. The total outstanding debt for Debtors was $475 million and Applicant originally sought a restructuring fee of $4.6 million. Following negotiations with Debtors, Applicant agreed to reduce its Restructuring Fee to $3.5 million.

---

[6]The Contentions of Applicant are from the Memorandum of Miller Buckfire & Co., LLC in Support of its Final Fee Application and in Response to Objections (hereafter"Memorandum") (proceeding no. 2316) and the testimony from Mr. Durc Savini and Mr. Chuck Bloome at the hearing on October 17, 2005.

[7]Mr. Durc Savini, a managing director and partner at Miller Buckfire, testified that in distinguishing investment bankers from financial advisors, it is based upon one's background skills. As investment bankers, Miller Buckfire also performs financial advisory services.

[8] In his affidavit submitted with the Applicant's Memorandum, Mr. Savini stated that restructuring fees are usually fixed fees. (Proceeding No. 2345)

[9] Mr. Bloome was the Chief Financial Officer for Citation nearly five years. He left Citation in June 2005.

4

In support of its requested fees, Miller Buckfire prepared and submitted a chart showing fee arrangements and outcomes of various investment bankers in chapter 11 cases involving total debt of $300 million to $600 million.[10]  The Applicant contends the fees are generally calculated as a percent of the face value of the outstanding debt (generally one percent, but less for companies with debt in excess of one billion).  According to the chart, fees sought by Applicant in this case are below average.  Mr. Bloome testified that he was familiar with Applicant's chart, and he did not find Applicant's fee unreasonable.  Applicant asserts that its employees worked a total of 4,107.5 hours on this case; this included 900 pre-petition hours[11] and 3,270.5 hours during the pendency of the case.  Miller Buckfire argues that to calculate its fee pursuant to the lodestar method (reasonable hours times reasonable hourly rate) is inappropriate, as it does not charge on an hourly basis. Applicant further contends that Debtors' hourly calculations of its fee are inaccurate and that Miller Buckfire would not have taken this job if Debtors had not agreed up front to the Restructuring Fee.

Mr. Bloome testified he had daily contact with Miller Buckfire[12] and believes that Citation received their end of the bargain.  The Applicant assisted Citation and their attorneys in negotiations with the banks regarding the terms of the chapter 11 Plan.  Mr. Savini testified that Debtors' engagement limited the Applicant's acceptance of other engagements. Additionally, the Applicant insists that it performed a significant amount of due diligence to understand the Debtors' business and

---

[10]Mr. Savini testified that the chart comparables were kept in the ordinary course of business by Miller Buckfire and that the information is used for fee applications or 11 U.S.C. § 328 retentions.  See Applicant's Exhibit 4.

[11]Mr. Savini testified that he worked or supervised most of the 900 pre-petition hours.  As of the retention hearing, Miller Buckfire was fully paid for pre-petition services.

[12]Mr. Savini and Mr. John Bosaco were Mr. Bloome's primary Miller Buckfire contacts.

5

their markets. Mr. Savini testified that this involved a good deal of reading research and industry reports in order to grasp Citation's product, market, and customers. A critical path timeline was prepared by Mr. Savini and distributed to all the parties involved. Miller Buckfire alleges it also provided additional services to those set forth in the Engagement Letter, and that these services were necessary and beneficial to the estate.[13] These extra services included: providing exit financing; preparing a liquidation analysis; negotiating a key employee retention plan; and receiving public debt ratings from rating agencies. Citation's President and Chief Financial Officer, Mr. Edwin Buker, also testified that the third-party financing obtained by Miller Buckfire benefitted the company. Applicant contends that Debtors' chapter 11 case did not take an unexpected path and that with its assistance, the prospect of a debt-to-equity conversion was possible from the outset. Mr. Savini testified that all of the parties and their attorneys agreed that the Debtors needed an abbreviated chapter 11 process. Applicant alleges the Engagement Letter foresaw that the restructuring fee may not have been predicted with complete accuracy and urges the Court not to punish it because its work did not take longer.

**B. Contentions of Debtors**[14]

At the hearing on the fee application, Debtors (for the first time) contended that Miller Buckfire had a conflict of interest in its representation of Citation. On cross-examination of Mr.

---

[13]Mr. Savini admitted that despite what was set forth in the Engagement Letter, these "extra" services were presented to the Court as services that would be provided by Miller Buckfire upon its retention.

[14]The Contentions of Debtors are from the Objections of Citation Corporation (proceeding no. 2322) and JP Morgan Chase Bank (proceeding no. 2330) to the Final Application of Miller Buckfire for Allowance of Compensation and Reimbursement of Expenses and the testimony from Mr. Edwin Buker and Mr. William Redmund at the hearing on October 17, 2005.

Bloome and Mr. Savini, the Debtors attempted to show that Miller Buckfire, Mr. Bloome and certain Board members had loyalties to Kelso[15] rather than Citation. Mr. Bloome admitted that he had worked for Kelso entities in the past, but that these prior connections in no way interfered with his duties as Chief Financial Officer for Citation. Mr. Savini admitted to having "helped" Kelso in a "restructuring" regarding Citation from September to December of 2003.[16]

Although Miller Buckfire competently rendered its services, Debtors contend the services provided were less extensive than anticipated by the agreement and did not provide such a benefit to Citation or the bankruptcy estates to justify a fee of $3.5 million. Debtors argue that what it has paid Applicant to date, $1,461,290.32[17], for pre and post-petition services is reasonable under the circumstances. When they entered into the agreement, it appeared that the chapter 11 reorganization would be lengthy and complex. However, the Applicant's responsibilities were much less in this case because ownership was essentially turned over to the Debtors' secured creditors. Debtors argue the Engagement Letter and the Retention Order anticipated Miller Buckfire and its professionals expending substantial time and effort.

Citation's President and Chief Executive Officer, Mr. Buker, testified that although Citation agreed to Miller Buckfire's capped fee up front and Miller Buckfire did what Citation asked them

---

[15]Kelso Investments (hereafter "Kelso") and other related or connected entities were lenders and are creditors of several of the Debtors.

[16]He testified he was not materially involved in this transaction and that Miller Buckfire may have put in approximately 100 hours. The Applicant received no compensation for this work, nor was there an engagement letter. Mr. Savini testified this free assistance was given in hopes that Kelso would engage them in the future for a fee. He further admitted there was no "beauty contest" for Miller Buckfire's engagement with Citation.

[17]This amount is included in Debtors' Objection, but as noted later in this opinion, it may not be the correct amount. (Proceeding No. 2322)

7

to do for the most part, at the conclusion it did not earn the total requested fee. In support of his position, Mr. Buker stated three things which he understood the Engagement Letter to contain and which ultimately did not occur. These were: utilizing Citation's customer base rather than debtor-in-possession financing; initially examining a sale process to determine valuation; and bringing acceptable financing to the table. Although he admitted that the third party financing brought by Miller Buckfire did benefit Citation, Miller Buckfire, in his belief, was never called upon to provide the level of services originally contemplated. Mr. Buker would not have voted for the employment of Miller Buckfire had he known its total fee would break down to nearly $1000.00 per hour if calculated on an hourly basis (hours claimed and total fee requested).

Mr. William Redmund[18], Chairman of the Board of Directors for Citation, testified that he and the Board unanimously agreed the Applicant's fee is too high. His objection to the fee was based on his conversations with Mr. Buker and his own review of the work done and other associated fees. Although he admittedly did not look at comparables, Mr. Redmond believes that Citation did not have a successful recapitalization. Mr. Redmond further testified that in his opinion, Miller Buckfire, in order to earn the fee of an investment banker, should have performed a specific transaction, such as a sale or acquisition. Rather, Miller Buckfire performed only the services of a financial advisor[19] and should be paid hourly. Therefore, the Debtors urge that the lodestar method is an appropriate method to calculate these professional fees.

In the "Time Records by Professional" included as Schedule 2 of the Application, Miller

---

[18]Mr. Redmund is also currently President and CEO of GenTek, Inc.

[19]Mr. Redmund testified that financial advisors advise clients on a variety of topics and that Miller Buckfire's services did not rise to the level of investment banker.

Buckfire represented its employees expended 3,270.5 hours on the Citation engagement. The Bankruptcy Administrator objected to 671 hours in the Applicant's first four interim applications, some of which regarded Miller Buckfire's 307.5 hours spent on its own retention and fee applications. Debtors contend that even if all 100 hours of Miller Buckfire's fifth fee application were allowed and the Bankruptcy Administrator's prior objections were sustained, this would result in 2,627.5 allowable hours. According to the Debtors' calculations, using 2,627.5 hours, Applicant in effect is requesting an hourly rate of $1,389.15. Debtors note that if the recommendations of the Bankruptcy Administrator on the prior fee applications of Miller Buckfire are accepted, the hourly rate that results ranges from $260.87 to $331.12. Thus, Debtors suggest that applying the lodestar method to the approved number of hours as recommended by the Bankruptcy Administrator results in an award of $734,562.37.[20] In the alternative, Debtors argue that if Applicant's total number of hours, 3,270.5, is approved and if the compensation to Miller Buckfire remains at the $1,461,290.32 already paid (according to Debtor), this would result in a blended hourly rate of $446.81. Debtors also contend that 75 percent of the work performed by the Applicant was by junior personnel and thus a higher hourly rate is not appropriate. The Debtors would consent to an aggregate fee of $2 million, inclusive of all amounts paid to Miller Buckfire and expenses incurred. (Proceeding No. 2322) Debtors suggest that this would compensate each professional who worked on Citation for Applicant at a rate around $600.00 per hour.

**C. Other Professionals**

In these chapter 11 cases, about a dozen professional firms were employed by the Debtors and

---

[20]Roughly calculated, this represents 2,626 hours at hourly rates of $260.87 to $331.12. See Debtors' Objection, page 9, note 7.

9

the unsecured creditors committee. These firms included attorneys, financial advisors, an industry consultant and accounting firm. Early in these cases, the parties and the Bankruptcy Administrator's office agreed upon a procedure which allowed these professionals to file fee applications every 30 days. The applications were generally set for hearing approximately 60 days after filing to allow the Bankruptcy Administrator's office ample opportunity to review each and every application.

Despite the volume and number of the applications, the Bankruptcy Administrator's office was able to review all of these applications and file reports for the parties and the Court. The reports reflected any objections or recommendations from the Bankruptcy Administrator. In general, the Bankruptcy Administrator had several recurring objections including the rate charged for travel time, the hourly rate for paralegal time and some objections to certain expenses.

After confirmation, the Court encouraged the parties to resolve these objections. Over several months and with substantial pressure from the Court, these objections were resolved and virtually all professionals received less than 100 percent of what they requested.

These fee reductions in no way reflect that any professional provided less than 100 percent of the expected services. In fact, this Court believes that all of the professionals performed their services well, in a timely fashion and all contributed to a successful chapter 11 case with a confirmed plan in roughly eight months from the original filing of the cases.

## II. CONCLUSIONS OF LAW

### A. Alleged Conflict of Interest

Debtors asserted at the hearing on these fees that they had discovered a potential or actual conflict of interest that existed for the Applicant. The Debtors argued that Applicant's prior employment or connections with Kelso should disqualify Applicant. The testimony or evidence

10

presented did not convince the Court that Applicant's services were deficient or that its services were rendered to benefit any entity other than the Debtors.  Applicant was an advisor and not in a position of decision making or ultimate authority.  Citation had extremely competent management and counsel to ensure no biased recommendations would be accepted and no inappropriate decisions made. Finally, there was the additional insulation of any potential influence in that the Agent, its competent counsel, the unsecured creditors committee and its competent counsel were involved in the ultimate decisions based on advice from their own professionals as well as from Applicant.  The Court finds that the objections based upon this argument are due to be overruled.

## B. Reasonableness of Fees and Expenses

The Bankruptcy Code provides that a professional person employed to represent a trustee[21] in bankruptcy may be awarded "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses."11 U.S.C. § 330 (a)(1)(A) and (B). A professional person seeking fees and expenses must file a detailed application which includes descriptions of the services rendered, the amount of the hourly rate requested and the total number of hours the applicant alleges were expended. Fed. R. Bankr. P. 2016; Loranger v. Stierheim, 10 F.3d 776 (11th Cir. 1994), Brake v. Tavormina (In re Beverly Manufacturing), 841 F.2d 365 (11th Cir. 1988), American Benefit Life Insurance Co. v. Baddock  (In re First Colonial Corporation of America), 544 F.2d 1291 (5th Cir. 1977), In re Gold Seal Products Company, Inc., 128 B.R. 822 (Bankr. N.D. Ala. 1991).  After such application is filed, the burden remains on the applicant to establish that the fees and expenses requested, including the hourly rate, the hours expended, and the costs, are reasonable and necessary.

_____

[21]In a chapter 11, it is generally the debtor-in-possession that employs these professionals pursuant to 11 U.S.C. § 1107.

11

The Court must then review the application, challenge any fees or charges that may be inappropriate, even in the absence of an objection, and determine the reasonableness of the fees and expenses requested. Gold Seal, 128 B.R. at 827. If the Court determines that the amounts requested are either unreasonable or unnecessary, then the Court, "itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees" must determine, set, and award an appropriate amount. Norman v. Housing Authority of the City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988).

In determining professional fees the Court must go through several steps:

1. Determine if the fee application is sufficient
2. Independently review the application as to the reasonableness and necessity of the amounts requested
3. Make an initial determination as to an appropriate fee award by:
   a) determining the nature and extent of the services
   b) determining the value of the services
   c) considering the factors in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)
4. Determine the Lodestar[22]
   a) Reasonable hourly rate considering some or all of the Johnson factors
   b) Reasonable number of compensable hours
   c) Adjustment to the Lodestar
5. Conclusion as to amount of fees due
6. Review of expenses and conclusion as to amount due

A bankruptcy judge has broad discretion in determining reasonable fees for professionals in bankruptcy matters. First Colonial, 544 F.2d at 1298. However, the approach in reviewing professional fees as adopted by the United States Supreme Court and the Eleventh Circuit Court of Appeals is designed to be objective. See Norman, 836 F.2d at 1299. This approach also provides a

---

[22]The Court recognizes that this Applicant did not seek to be employed on an hourly basis. Nevertheless, the Court finds that determining and then reviewing the fees requested using the lodestar approach is a factor to consider.

Case 04-08130-TOM11    Doc 2657    Filed 02/17/06    Entered 02/17/06 13:48:34    Desc
Main Document      Page 12 of 22

standardized review that professionals can rely upon when requesting approval of their fees and helps ensure that professionals in bankruptcy cases are paid no less and no more than outside the bankruptcy arena.

## 1. Sufficiency of the Fee Application

At least one court has noted that "a well prepared fee application also would include a summary, grouping the time entries by the nature of the activity or stage of the case." <u>Norman</u>, 836 F.2d at 1303. The Applicant did provide general summaries of time spent by its employees on this case in conjunction with each fee application. No party has suggested the fee applications were not sufficient and the Court finds that they were sufficient.

## 2. Independent Review of the Application

The Court independently reviewed the Applications and heard the testimony at the hearing of this matter. In addition, the Debtor-in-Possession and JP Morgan Chase Bank filed objections to the reasonableness of the fees requested by Applicant, and the Court has considered these objections.

## 3. Initial Determination as to an Appropriate Fee Award

### a) Nature and Extent of the Services

Applicant was hired to provide assistance to the Debtors in their financial reorganization. This assistance was intended to assist the Debtors in finding a lender and acceptable terms for financing its reorganization and to provide the Debtors other advice or help with its financial restructuring. Mr. Savini and others at Miller Buckfire became familiar with Debtors' businesses and assisted in negotiations to help the Debtors propose a plan to exit from bankruptcy and continue the business operations.

### b) Value of the Services

13

Applicant maintains that the value of its services is $3.5 million, the amount negotiated for at arms length and contained in the Engagement Letter. Further, Applicant maintains that this amount is consistent with other fees awarded in similar bankruptcy cases and is appropriately based upon a percentage of the outstanding debt. Applicant asserts that it would not have entered the contract with Debtors had Debtors not agreed to the fee. Finally, Applicant offered Mr. Bloome's testimony that this was the bargained for fee, less than originally requested by Applicant, and that the Debtors benefitted from the services rendered.

It appeared to the Court that Mr. Bloome believed that since there was an agreement and Applicant had performed services as requested and when requested, the fee as agreed should be paid. The Court respects this view, and recognizes both the value of Applicant's services and the value of Mr. Bloome and his services to these Debtors and this Court. All of these services contributed to the successful reorganization of these Debtors. However, "in this particular context, a 'success fee' is less a bonus than it is an incentive, designed to induce maximum return."[23] Thus, simply because the fee in this case was agreed upon up front in the contract as a prerequisite to Applicant's participation in this case is not a controlling factor for this Court, but is considered relevant.

The Court also has considered the testimony of Mr. Buker who testified that Applicant had not been required nor requested to provide the same level of services as originally anticipated. In essence, the Debtors' view seems to be that the negotiations and restructuring with the secured lenders were not as complex, protracted or as lengthy as may have been originally contemplated.

In this case, Miller Buckfire contributed to the success of the case as did all of the other retained professionals. The success cannot be attributed solely to the efforts of Miller Buckfire.

---

[23]In re Interlogic Trace, Inc., 188 B.R. 557, 560 (Bankr. W. D. Tex. 1995).

Case 04-08130-TOM11    Doc 2657    Filed 02/17/06    Entered 02/17/06 13:48:34    Desc
Main Document        Page 14 of 22

Given the conflicting testimony as to how time was spent and the value of the services provided by Applicant, it was incumbent on Applicant to tip the scale and convince the Court that the value of its services were as requested. The Court finds that Applicant established that the services it provided were valuable and contributed to the successful reorganization of Debtors, but the Court does not find the value of the services is as requested.

c) **The __Johnson__ Factors**

1) *Time and labor required*. Applicant's time and labor are set out in the Application. The crux of the objections seem to be directed not at the total amount of time, except to note that a substantial amount of time (about 300 hours or 10 percent of the total amount of time) was devoted by Applicant to approval of its employment and approval of its fees.

2) *Novelty and difficulty of the questions*. The issues in this case did not seem to have been novel, though Applicant noted it took some time to learn the business and industry of the Debtors.

3) *Skill requisite to perform the services properly*. Applicant appears to have the skills that were necessary to perform the services requested and required of its employees.

4) *Preclusion of other employment by the attorney due to acceptance of the case*. Mr. Savini testified that accepting this engagement or employment precluded Applicant from taking or accepting other employment. The Court acknowledges that in every employment situation, a professional may have to limit the number of matters or clients it can take at a given time.

5) *Customary fee*. Applicant offered a list of fees charged and awarded by similar professionals in other bankruptcy cases to show that the fees requested are customary. The requested fees in this case appear to be consistent or comparable with the customary fees

15

provided in the chart.[24]  However, the Court cannot justify an award of the requested fees based upon the alleged market rate in the chart without knowing the facts, complexity and quantity of service in each of those cases represented by the chart.  In general, the fees requested appear consistent, but it was the Applicant's burden to establish that the services provided in those cases are consistent with the fees requested in this case.[25]

6)  *Whether the fee is fixed or contingent*.  All fees in this case as in any bankruptcy case are generally subject to two contingencies: 1) approval by the Court and 2) the debtor's ability to pay.

7)  *Time limitations imposed by the Court or other circumstances*.   No testimony or evidence was  presented to suggest that this was an applicable factor in this case other than to note that the Plan was confirmed eight months after the petitions were filed.

8)  *Amount involved and results obtained*. The Court finds from the testimony of Debtors' witnesses that Applicant was never called upon to provide the level of services as originally anticipated in the Engagement Letter.  Although Applicant assisted Debtors in achieving a confirmed plan within eight months of filing the chapter 11, Debtors were essentially bought out by its secured lenders in exchange for a discharge of debt, with general unsecured creditors receiving a pro rata distribution of $10 million funded by Debtors.

9)  *Experience, reputation and ability of attorneys*.  The Court has no reason to question the ability of the Applicant as an investment banker, and the Court finds that the Applicant had

---

[24]See Applicant's Exhibit 4.

[25]The Applicant offered this chart to reflect that a percent of the debt is an acceptable fee and consistent with market rates.  This Court is unwilling to blindly accept that conclusion.

16

sufficient experience to perform the work it was employed to do.

10) *Undesirability of the case*. The Court is unaware of any reason this matter would be undesirable to Applicant as an investment banker.

11) *Nature and length of the professional relationship with the client*. Applicant had no prior contractual relationship with the Debtors and specifically testified that it received no compensation for work done in 2003 prior to its engagement in this case.

12) *Awards in similar cases*. As mentioned above, Applicant provided the Court with a chart showing alleged comparable fees of similar engagements in other cases. However, this Court is not inclined to rely solely on these comparable fees without knowing the circumstances and facts surrounding those cases.

## 4. Determination of the Lodestar

_____There is a difference of opinion regarding how to evaluate investment banker fees. Some courts reject the lodestar method outright and apply a market rate, while others allow a success fee only if it passes the court's close scrutiny. See In re EWI, Inc., 208 B.R. 885, 891 (Bankr. N.D. Ohio 1997) (the lodestar method is inappropriate where an engagement letter provided for a fixed fee); In re Palm Beach Cruises, S.A., 208 B.R. 78, 84 (Bankr. S.D. Fla.1997) (a court should look at results rather than time expended by the investment bankers); In re Interlogic Trace, Inc., 188 B.R. 557,560 (Bankr. W.D. Tex. 1995) (the lodestar method was constructed for attorney's fees and "offers little assistance in the context of success fees for business consultants..."); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 27 (Bankr. S.D.N.Y. 1991) ("we hold that end bonuses or sign-on bonuses are not per se barred by § 328...[but] require close scrutiny and, in appropriate circumstances, may be permissible"). Other courts conclude that the lodestar method or a similar reasonable hourly rate is the appropriate determination of investment banker fees. See In re Commercial Services, Inc., No.

03-5161, 2005 WL 2746699, at *5 (10th Cir. Oct. 25, 2005) (rejecting marketplace arguments and upholding the use of an adjusted lodestar method to be used "to determine the reasonableness of a required professional fee in the context of § 330."); In re Commercial Financial Services, Inc., 298 B.R. 733, 748-49 (10th Cir. 2003) (affirming the bankruptcy court's application of an hourly rate to investment banker fees); In re Northwestern Corp., 324 B.R. 538 (Bankr. D. Del. 2005) (reviewing investment banker fee application under § 330 reasonableness standards and ultimately applying its own hourly rate); In re Gillet Holdings, Inc., 137 B.R. 452 (Bankr. D. Colo. 1991) (rejecting investment bankers' requests for set fees rather than applying for hourly fees subject to reasonableness standards). This Court concludes that the lodestar method by itself is not a determining factor in approving investment banker fees. However, examining this method is helpful when analyzing fees requested along with the other factors addressed in this opinion.

**a) Reasonable Hourly Rate**

Initially, Citation agreed to pay Miller Buckfire $150,000.00 upon executing the Engagement Letter, $150,000.00 per month, and a restructuring fee of $3.5 million. The monthly payments of $150,000.00 (that began in August 2004) were to be credited against the success fee. Citation claims it has paid Applicant $1,461,290.32[26] to date. Miller Buckfire now seeks the remaining $2,291,128.45 it claims is due. Miller Buckfire requests final approval of its fees including the $3.5 million success fee, and claims the balance due is around $2.2 million after crediting the payments received. Applicant argues it performed its end of the bargain and that this fee is consistent with market prices for investment bankers, as reflected in the chart prepared by Miller Buckfire.[27] While Applicant contends the Johnson factors support its fee, it argues that the reasonableness of its overall

---

[26]Applicant contends it has been paid $1,189,622.90 to date. See Proceeding No. 2316.

[27]See Applicant's Exhibit 4.

18

fee should not be analyzed by determining the reasonable number of hours nor a reasonable hourly rate. Debtors and Agent argue, however, that the Johnson factors are applicable and that this Court should determine a reasonable hourly rate for Applicant.

Applicant submitted that it has performed 3,270.5 hours of service for Debtor since the filing of these cases. The Bankruptcy Administrator objected to 671 hours in some of the interim fee applications. Assuming that all of the 100 hours submitted in the final fee application were approved and applying the hourly rates which result when accepting the rates used by the Bankruptcy Administrator in his recommendations[28] to the allowed number of hours would result in an award of $734,562.67, which is obviously less than that already paid to date. If the Applicant is awarded $1,461,290.32, this would result in a blended hourly rate of approximately $446.81 per hour. Otherwise, if Applicant's hours (3,270.5) are approved and the $3.5 million is approved, this would result in a hourly rate of $1,389.15. The Court concludes that a reasonable hourly rate is more than the $260.00 to $331.00 used by the Bankruptcy Administrator, but less than the $1,389.15 claimed.

b) **Reasonable Number of Compensable Hours**

Again the Court has reviewed this in light of all of the Johnson factors and finds that the amount requested is not a reasonable number of hours. As mentioned above, Applicant expended 3,270.5 hours of work, but of this, 307.5 hours reflect work on their own retention and fee applications. Also, the Bankruptcy Administrator objected to 671 hours in the first four interim applications. The Court finds that the reasonable number of hours for this Applicant is 2,850 hours. The Court arrived at this number as follows: 3,270.5 as requested hours; less a reduction of 280.0 hours on Applicant's retention and compensation; and less an additional reduction of 140.5 hours expended on various matters noted by the Bankruptcy Administrator.

---

[28]See supra note 20, page 9.

19

## c) **Adjustments to the Lodesta**r

To assist in its review and to clarify the amounts awarded (and presumed paid) the following information is helpful.

| Interim Applications | Date | Hours Spent | Requested Fee | Awarded Fee |
|---|---|---|---|---|
| First Application | 9/18/04 to 12/31/04 | 1521 hours[29] | $515,000.00 | $457,431.00[30] |
| Second Application | 1/01/05 to 1/31/05 | 568 hours | $150,000.00 | $137,191.90[31] |
| Third Application | 2/01/05 to 2/28/05 | 485.5 hours | $150,000.00 | $110,607.62[32] |
| Fourth Application | 3/01/05 to 4/30/05 | 596 hours[33] | $300,000.00 | $267,440.00[34] |
| Fifth Application | 5/01/05 to 5/23/05 | 100 hours | $111,290.32 | |
| Pre-petition Monthly Advisory Fees | | | | $235,000.00[35] |
| Totals | | 3,270.5 hours | $1,226,290.32 | $1,207,670.50 |

---

[29] The hours per month are as follows: 9/18/04 to 9/30/04: 90.5 hours; 10/1/04 to 10/31/04: 277.5 hours; 11/1/04 to 11/30/04: 575 hours; 12/01/04 to 12/31/04: 578 hours.

[30]Proceeding No. 1561.

[31]Proceeding No. 1916.

[32]Proceeding No. 2087.

[33]The hours per month are as follows: 3/01/05 to 3/31/05: 453 hours; 4/01/05 to 4/30/05: 143 hours.

[34]Proceeding No. 2218.

[35]Paid pre-petition per Fifth and Final Application for Allowance of Compensation, page 2, note 1. (Proceeding No. 2316)

20

After determination of the reasonable hourly rate and the reasonable number of hours expended, the Court can further adjust the lodestar based on the services performed or for the results obtained so that the end result is not excessive. This may be done by identifying the number of hours related to specific unsuccessful matters or by merely reducing the entire application by some proportionate amount. Norman, 836 F.2d at 1302. This Court finds that an adjustment is appropriate for three reasons: 1) the services originally anticipated were not actually required; 2) the hours expended were slightly excessive; and 3) the resulting hourly rate was also excessive. However, the Court has also taken into consideration that Applicant expended approximately 900 hours pre-petition in addition to the 3,270.5 hours post-petition. Applicant has credited fees paid pre-petition and the Court is compelled to not overlook this factor.

**5. Conclusion as to the Amount of Fees Due**

Based on the conclusions in this memorandum opinion, the Court finds that Miller Buckfire is due total fees of $2,137,500.00. If the lodestar were applied, this would mean 2,850 hours at $750.00 per hour.

**6. Expenses**

On November 30, 2005, counsel for Applicant submitted a letter to this Court indicating that Applicant, Debtors and the Bankruptcy Administrator had settled any objections as to expenses (excluding attorneys' fees) and that Applicant is due expenses of $65,148.51. All that remains for this Court to consider is Applicant's request for reimbursement of attorney fees in the amount of $110,351.80. No itemization of these expenses was provided nor was any testimony offered. Further, these fees were primarily for Applicant's benefit in seeking to be employed and in seeking to be compensated. The Court concludes that these fees in the amount of $110,351.80 are not due to be approved.

21

### III. CONCLUSION

Applicant is due reasonable fees of $2,137,500.00 and expenses of $65,148.51, less amounts already paid. Debtors shall remit the balance due to Applicant. Accordingly, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the Application is approved in the reduced amount of $2,137,500.00 in fees and $65,148.51 in expenses, less amounts already paid.

Dated this the 17th day of February, 2006.

**/s/ Tamara O. Mitchell**
Tamara O. Mitchell
United States Bankruptcy Judge

TOM:eaj

xc:   Michael L. Hall, Shannon Hoff, Glenn E. Glover and Douglas Bacon, attorneys for Debtors
Matthew Feldman, attorney for Applicant
Robert Adams and Kim Glass, attorneys for Agent
David B. Anderson and Donna McGee, attorneys for Citation Funding, JP Morgan Chase, Wachovia Capital, Kelso Investment, KEP IV, and Magnetite Asset Investors
Jayna P. Lamar, attorney for the committee claims monitor
Lee R. Benton, attorney as conflict counsel for the claims monitor committee
Valry W. Early, Bankruptcy Administrator
John Dudeck, attorney for the Bankruptcy Administrator's office